[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried before the Regional Family Trial Docket, on a referral from the Tolland Judicial District, on February 27th, 2003. The Plaintiff and Defendant testified and numerous exhibits were introduced. The court has considered all of the credible evidence presented to it and carefully considered the respective criteria for orders of child support, health insurance, payment of children's medical expenses, alimony, property settlement, division of debt and award of counsel fees. The court makes the following findings of facts and orders:
The parties were married on August 27, 1983, in East Hartland, Connecticut. The court finds that it has jurisdiction over the marriage. One of the parties has lived in the State of Connecticut for more than one year prior to bringing this action. The following minor children have been born to the parties since the date of the marriage:
Krystal Leigh Lamson; date of birth September 29, 1985;
Arthur Sherman Lamson, IV, date of birth January 3, 1987; and
Ryan Matthew Lamson, date of birth May 29, 1989.
No other minor children have been born to the Wife since the date of the marriage. The parties are not receiving state assistance. The court finds that the marriage between the parties has broken down irretrievably and there is no reasonable prospect of reconciliation.
The Wife is 49 years old and has been employed by Hallmark Cards for 15 years as a Stock Handler; she earns $35,828 per year and works the third shift from 11:00 p.m. to 7:30 a.m. Mrs. Lamson testified that her job was stable.
Mr. Lamson is 48 years old and has been employed by Pratt Whitney CT Page 3141 Aircraft for 24 years as a Sheet Metal Fabricator and currently earns approximately $54,548 per year. However, in 2002, he earned approximately half that amount due to his failure to work from approximately May 2002-December 2002. Mr. Lamson testified that he did not work in the spring or summer of 2002 due to lack of work (although the court notes he was not laid off) and admits he did not work in the late summer and fall due to illness and alcoholism (Defendant's Exhibit H). Mr. Lamson testified he did not feel his job was stable although he professed to have the desire to continue to work. In late summer 2002, Mr. Lamson was hospitalized for 2 weeks with pancreatitis due to his abuse of alcohol (Defendant's Exhibit H). At the time of trial, the Husband claimed to be physically and mentally able to care for his children.
The family home, located on 41 Douglas Road, Enfield, CT, was purchased by the couple in 1986. The Wife testified that a minimal down payment was required because the couple qualified for a CHFA mortgage and the source of the down payment was marital savings. The Husband disputed her testimony and claimed the down payment came from his 401k. Since the bulk of the 401k was earned during the marriage, the court considers that the source of the down payment was from marital funds. The house was appraised for $135,000 in October 2001 (Plaintiff's Exhibit 2). The parties submitted no other evidence of the current value of the marital home. The balance of the existing mortgage is approximately $45,000, leaving equity in the home of $90,000.
The mortgage is currently in arrears and a foreclosure notice has been sent as a result of the Husband's contempt of the Pendente Lite order requiring him to pay the mortgage. Mr. Lamson was incarcerated overnight as a result of this contempt. Although the Husband's Financial Affidavit failed to disclose it, he had $2,300 in his credit union account on the date of the contempt. The amount currently needed to bring the loan current is $6,323.56 (Plaintiff's Exhibit 9). The Plaintiff's counsel is holding approximately $5,300 as a result of contempt proceedings and has negotiated a payment schedule for the balance due. During the course of this case, the Husband agreed to refinance the family home on two occasions (Stipulation dated October 10, 2001, Plaintiff's Exhibits 1 8) and failed to complete the refinancing. In reliance on the Defendant's agreement to refinance the family home the Wife vacated the marital residence and put a deposit on a home in November 2001. As a result of the Husband's failure to refinance the home in October 2001, the Wife lost a $500 deposit and $900 in inspection and appraisal fees.
The Plaintiff also lost a contract for a second home when the Husband failed to refinance in January 2002 pursuant to a stipulation dated January 4, 2002 (Plaintiff's Exhibit 8). Mr. Lamson claimed he was unable CT Page 3142 to meet the bank condition that 50% of the First USA credit card be paid off before refinancing. However, in the stipulation (Plaintiff's Exhibit 8), the Wife agreed to reduce her share of the equity in the family home by half the First USA credit card debt; the Husband still failed to refinance the family home.
The Wife vacated the family home in October 2001, based in part on the Husband's agreement to refinance the family home and provide her with cash for a down payment on her own home. She resided with her sister until June 2002, when she rented an apartment for herself and two daughters. The Wife testified that from the time she left the family home, until December 2001, she would go to the home daily to transport the children to their after-school activities and make dinner. Thereafter, she met the children outside the family home and took them out to dinner.
Mr. Lamson's sister, Sherry Sindland, was shocked by his appearance (which she likened to "Howard Hughes in his final days," Defendant's Exhibit H) when she saw him at a family reunion in August 2002. The following day, Ms. Sindland entered the family home and found the house in such disarray that she needed a shovel to remove the debris. She found the boys had been without soap, toothpaste or food and had been hiding their father's deteriorating condition from the rest of the family. Shortly thereafter, Mr. Lamson entered the hospital and the Wife was awarded exclusive possession of the family home. Ms. Sindland reported to the Family Relations Counselor, John Bell, that since the children have been back together in the family home they seemed happier than she had seen them in two years (Defendant's Exhibit H).
Mr. Lamson has been arrested for domestic violence (the charges were nolled), criminal trespass (charges pending) and DWI (charges dismissed after he completed the Alcohol Rehabilitation Program). The criminal trespass charge was for entering the family home on November 6, 2002 without permission after the Wife was awarded exclusive possession.
During the course of the divorce, the Husband admitted to smashing his Wife's collection of Snow Baby collectible figurines and pouring gasoline on a plant the Wife received from friends after her father died.
The Guardian Ad Litem, Attorney Thomas Fiorentino, testified that Mr. Lamson disagreed with his recommendations for custody and lost his temper during an after-hours telephone call.
The trial of this matter was originally scheduled to commence on February 4, 2003. However, on the previous day, Judge Graziani CT Page 3143 incarcerated Mr. Lamson for contempt (failing to make the mortgage payments). When Mr. Lamson arrived in court on February 4, 2003, he demanded to fire his lawyer, advised the court he was representing himself and expressed his anger in the courtroom both verbally and physically. Ultimately, Mr. Lamson had to be forcibly removed from the courtroom by two Marshals and the trial was continued until February 27, 2003. As a result of the Defendant's belligerent behavior in court, the Guardian Ad Litem filed an Application for a Protective Order on behalf of the minor children and Wife, which was granted ex parte and extended for six months on February 14, 2003 by Judge Graziani.
Mr. Lamson testified that he attended an in-patient substance abuse program at Alliance Treatment Center in Avon, CT for 10 days. While he admitted there was an aftercare recommendation, he is not currently in treatment for substance abuse, anger management or any other psychological problems. Mr. Lamson testified he is attending AA 5-6 times a week and claimed he has not had a drink since September 16, 2002. Mr. Lamson testified he did see a psychiatrist (who's name he could not recall) once for a sleep disorder problem and was told the psychiatrist did not treat substance abuse patients until they had been sober for 6 months.
The Defendant did not think he had a problem with alcohol until the end of the summer of 2002 when his sister discovered the conditions he and the two younger children were living in. The court examined Plaintiff's Exhibit 4, an account summary for Mr. Lamson's American Eagle Credit card. During 2001, Mr. Lamson made 31 purchases that can be identified as alcohol-related because they are from package stores. The first Family Relations Report (Defendant's Exhibit G) also indicates that the Defendant was consuming alcohol in excess and the comments of the children make it clear they were fully aware their father had a drinking problem.
Despite his repeated claims for primary residence of the children, or a 50/50 parenting access schedule, Mr. Lamson failed to advise Attorney Fiorentino of his alcohol treatment and progress. Additionally, no verification, other than the Defendant's own testimony, was submitted to the court to confirm that Mr. Lamson has been clean and sober since September 2002. This information would have provided both the court and Guardian with critical information and independent verification of the Husband's recovery. While the court hopes that the Husband's recovery is proceeding as rapidly as he testified, the best interest of the minor children justifies the caution recommended by the Guardian.
During the pendency of the case, Mr. Lamson withdrew $17,000 from his CT Page 3144 401K account in violation of the automatic orders and without permission of the court (Plaintiff's Exhibit 5). He claimed the funds were used to pay his legal retainer and that he repaid "some" family loans and "some" credit card debt. However, an examination of the Defendant's Financial Affidavit reveals that on January 2002 he listed his First USA credit card debt as $16,500 and his VISA debt as $2,500. The Defendant's February 2003 Financial Affidavit lists the First USA credit card debt as $19,000 and his VISA at $4,500.
The parties agreed to file joint 2001 Federal and State income tax returns (Plaintiff's Exhibit 8). The returns were prepared and the Husband refused to sign them. At trial, he testified that his Wife withdrew $8,000 from her retirement accounts without tax withholding and he did not want a smaller refund as a result. The Defendant did this despite the fact that he withdrew money from his 401K in 2000 and the Wife signed a joint tax return presumably reducing her refund that year.
The court finds that the Defendant Husband is at fault for the breakdown of the marriage. The Wife testified that for the past 8 years the Husband would drink from 6 to 12 beers every day. Although the Husband's shift ended at 3:30 p.m., he would not return home until 7:00 p.m. to 10:00 p.m., spending his time drinking or on union business rather than with his family. When the Husband was home he was drinking in the basement. The Wife's testimony is verified by the Family Relations Reports (Defendant's Exhibits G H), the Husband's credit card spending (Plaintiff's Exhibit 4) and his testimony that he spent 2 weeks hospitalized for alcohol-induced pancreatitis and 10 days in a substance abuse rehabilitation center. The court also finds fault in the Husband due to his anger management problem as observed by the court, the Guardian Ad Litem, and testimony of the parties.
As of the trial of this matter, Mr. Lamson continued to make light of the serious nature of his substance abuse problem and anger management issues. He claimed that his drinking had only become a serious problem in late summer 2002 just prior to his hospitalization. The court finds that the evidence demonstrates that this problem existed for years before the summer of 2002. The two youngest children were forced to hide their father's dysfunction from their family and lived in squalor for a significant period of time in 2002. Mr. Lamson continued his quest for primary residence and a 50/50 parenting arrangement when it was clear he was not capable of parenting his children adequately.
The Husband's anger has been evident from his destruction of property, arrests for domestic violence and repeated failures to obey court orders. Mr. Lamson denies the need for intensive mental health treatment CT Page 3145 and fails to grasp the impact his behavior has had on his children.
 ORDERS
After considering all of the statutory criteria set forth in General Statutes § 46b-84 as to support of a minor child, § 46b-215a-1
et. seq., Regs. Conn. State Agencies, as to child support, § 46b-62
as to counsel fees, § 46b-66a as to conveyance of real property, § 46b-81 as to assignment of property and transfer of title, §46b-82 as to the award of alimony, § 46b-84 as to medical insurance for minor children, together with applicable case law and the evidence presented here, the court hereby enters the following orders:
1. DISSOLUTION OF MARRIAGE:
A decree dissolving the marriage, on the grounds of irretrievable breakdown, shall enter on March 5, 2003.
2. CUSTODY:
A. Sole custody of the minor children shall be with the Plaintiff mother, Kathleen E. Lamson.
B. All access between the minor children and the Defendant father shall be supervised by his sister, Sherry Sindland, until such time as the Defendant father provides documentation that he is successfully engaged in a mental health treatment program to include aftercare treatment for alcoholism, anger management; access shall also be contingent upon the following:
(I) Father's complete and total sobriety verified by random urine tests performed by his aftercare treatment provider, and
(II) Father's regular attendance at A.A. meetings verified by a sponsor.
Until the Defendant has completed the above requirements, his access to the two youngest children shall be for a minimum of 4 hours weekly to be scheduled at a time and place convenient for Ms. Sindland and the minor children.
C. Upon Mr. Lamson's satisfaction of the aforementioned counseling, meeting the conditions of sobriety outlined above, and obtaining suitable living accommodations, he shall have the following visitation with the two youngest children: CT Page 3146
(I) Alternating weekends from Friday at 4:00 p.m. until Sunday at 5:00 p.m.
(II) One week night from 4:00 p.m. to 7:30 p.m. which shall be determined by the availability of the minor children and Father.
D. Upon Mr. Lamson's satisfaction of the aforementioned counseling and conditions of sobriety, he shall visit with Krystal for a minimum of 4 hours per week at times and places to be arranged between father and daughter taking into consideration Krystal's school, extracurricular and employment obligations.
E. Holidays: Upon Mr. Lamson's satisfaction of the aforementioned counseling and sobriety conditions, the Holidays shall alternate as follows:
Holidays Odd Years Even Years
Easter Father Mother
Mother's Day Mother Mother
Father's Day Father Father
Fourth of July Father Mother
Thanksgiving Mother Father
Christmas Eve Father Mother
Christmas Day Mother Father
F. Upon Mr. Lamson's satisfaction of the aforementioned counseling and sobriety conditions, he shall have two weeks summer vacation time, during one of the summer months of June, July or August, with 30 days written advance notice to the Wife. If the Husband's plans conflict with the plans of the Wife, then the Husband shall make alternate plans. The Husband shall have no overnight summer parenting time until he satisfies the above counseling and sobriety conditions.
G. The parties shall exert every reasonable effort to maintain free access and unhampered contact between the children and each of the parties and to foster a feeling of affection between the children and the other party. Neither party shall do anything which may estrange the CT Page 3147 children from the other party nor injure the opinion of the children as to their mother or father, nor act in such a way as to hamper the free and natural development of the children's love and respect for the other party.
H. The Wife shall notify the Husband in writing of all important matters pertaining to the children's health, education, welfare and upbringing.
I. In the event of the illness or personal injury of said children, the first party to learn of such illness or injury shall notify the other immediately and each party shall keep the other informed at all times of the whereabouts of said children. For the purposes of this paragraph, the word "illness" shall mean any sickness or ailment that requires the service of a physician. The word "injury" shall mean any injury that requires the services of a physician. During any illness or accident, the Husband shall have rights of reasonable visitation to see the children in addition to the other rights provided herein.
J. Each of the parties shall keep the other informed at all times of the whereabouts of the children while said children are with the Husband or the Wife. Each shall, if either has knowledge of any illness or accident or other circumstances seriously affecting the health or welfare of the children, promptly notify the other party.
K. Each of the parties shall furnish the other copies of any reports from third persons concerning health, education or welfare of the children. Each parent shall give the other forty-eight (48) hours advance notice of any special events involving the minor children including, but not limited to, plays, recitals, award ceremonies, banquets, sports activities, religious ceremonies, marriages, graduations, school conferences, sports meets and other ceremonies. Each party shall be responsible to transport the children to special sports events, ceremonies, concerts and school functions that are scheduled during that parent's visitation.
L. The Husband and Wife shall both have liberal telephone access to the children during reasonable hours and the children shall be free to contact the Husband or Wife by telephone at all times. Reasonable hours shall be defined as after 8:00 a.m. and before 10:00 p.m.
3. COLLEGE EDUCATION:
The parties shall contribute equally towards the equivalent of full-time in-state undergraduate tuition and room and board at the CT Page 3148 University of Connecticut and towards the expenses incurred by the minor children in connection with their enrollment in an accredited institution of higher learning. The parties' obligations under this provision shall cease and terminate as to the earlier of each child's twenty-third (23) birthday or graduation from a four-year college or its equivalent in accordance with Connecticut Public Act No. 02-128.
The Court shall retain jurisdiction to look at the college education issue in the future, if deemed necessary.
4. CHILD SUPPORT:
The defendant father shall pay guideline child support in the amount of $265.00 per week by an immediate wage garnishment. On September 19, 2003, when the eldest child attains the age of 18 years, the child support shall be reduced to $215 per week.
5. MEDICAL INSURANCE CHILDREN:
The defendant father shall provide medical/dental insurance for the benefit of the minor children, as well as for the benefit of any children who have reached the age of majority and are eligible for said coverage, as made available to him by his employer. All unreimbursed and uncovered expenses shall be divided with the Plaintiff Wife paying 60% and the Defendant Husband paying 40%.
The Plaintiff shall maintain her present policy of dental and vision care insurance, as available through her employer, for the benefit of the minor children.
In the event that the defendant father is no longer eligible for health insurance benefits for the children, he shall then give the plaintiff mother 30 days advance written notice by certified mail before the date coverage terminates, allowing her the opportunity to apply for health coverage for the children as made available to her through her employer. The Child Support Guidelines shall be recalculated to determine the division of unreimbursed medical expenses in the event the Wife provides health insurance coverage for the minor children.
6. REAL ESTATE:
The Defendant shall quitclaim his interest in the marital home, at 41 Douglas Road, Enfield, to the Plaintiff within 7 days from the date of judgment. If the defendant fails or refuses to sign a quitclaim deed within that time frame, the property shall be judicially transferred to CT Page 3149 Plaintiff pursuant to Conn. Gen. Stat. 46b-66a (b). Plaintiff shall execute a promissory note and mortgage in the amount of $25,000, in favor of the Defendant, payable at such time as Plaintiff sells the house, remarries or the youngest child attains the age of 18 years, whichever shall first occur.
The Plaintiff shall be entitled to refinance the family home in an amount not to exceed $100,000. The Husband shall subordinate his mortgage to the Wife's new mortgage if she elects to refinance the family home before the payoff of the Husband's share of the equity in the marital home.
This unequal division of property is in consideration of the Defendant's superior earning capacity; the court's belief that an alimony award would be appropriate in this case due to the parties' unequal earning capacity; the court's intention that the Wife remain in the family home with the children; the Husband's failure to refinance the family home on two occasions; the Husband's contempt of court orders that he make the mortgage payments; and the court's finding that the Defendant's alcoholism is the cause of the breakdown of the marriage.
7. ALIMONY:
Neither party shall pay alimony to the other. The court finds that both the Husband and the Wife are fully capable of supporting themselves and has adjusted for the difference in earning capacity by an unequal property division.
8. PENSIONS, IRA ACCOUNTS, 401K ACCOUNTS AND DEFERRED COMPENSATIONACCOUNTS:
The parties shall divide all pensions, IRA accounts, 401K accounts and deferred compensation accounts as listed below by means of Qualified Domestic Relations Orders, if needed. The parties shall equally share in the cost of preparing the necessary documents. Each party shall be awarded joint and survivorship benefits to protect each party in the event of the other's death.
a. UTC 401K: After a sum sufficient to pay the outstanding fees of the Guardian Ad Litem have been withdrawn, the Wife shall receive 50% plus half the amount withdrawn/borrowed pendente lite by the Husband.
b. UTC Pension: The Wife shall receive 50%.
c. Hallmark 401K: The Husband shall receive 50% plus half the sum CT Page 3150 withdrawn/borrowed pendente lite by the Wife.
d. Hallmark Cash Balance Retirement Benefit: Husband shall receive 50%.
e. Wife's Thrift Plan: Husband shall receive 50%.
9. TAX RETURNS:
The Plaintiff shall be entitled to file 2001 and 2002 Federal and State income tax returns as head of household, claiming all four children as exemptions.
10. DEPENDANCY EXEMPTIONS:
Commencing tax year 2003, each party shall claim two children as exemptions so long as four children are available. At such time there are three children available, the parties shall alternate two children and one child annually, with the Wife receiving two exemptions the first year that three dependency exemptions are available. At such time as two children are available, each party shall claim one child. At such time as only one child remains, the parties shall alternate the exemption for said child, the Plaintiff beginning with the first year. In the event the Defendant is delinquent in child support payments as of December 31st of any calendar year, the Plaintiff shall be entitled to claim all available children as exemptions.
11. DIVISION OF DEBTS:
Except as otherwise provided herein, the Husband shall be responsible for the debts on his financial affidavit and the Wife shall be responsible for the debts on her financial affidavit.
The First USA Credit card, with a current balance of $19,000, shall be divided with the Wife paying $8,200 and the Husband paying $10,800.
12. LIFE INSURANCE:
The Husband and Wife shall continue to maintain their existing policies of life insurance naming the minor children as the beneficiaries until all the children have reached the age of majority. The parties shall provide the other proof of said insurance on an annual basis upon written request.
13. MOTOR VEHICLES: CT Page 3151
The Wife shall be entitled to sole ownership of the 1997 Buick Regal. The Wife shall hold the Husband indemnified and harmless from the loan, taxes, registration and insurance for said vehicle.
The Husband shall be entitled to sole ownership of the 1979 Chevy Van, 1982 Chevy Pickup Truck, 1989 Ford Taurus and motorcycle listed on his Financial Affidavit. The Husband shall hold the Wife indemnified and harmless from the taxes, registration and insurance for said vehicles. The parties shall immediately complete and sign any paperwork necessary to change title and registration on the above vehicles.
14. FEES AND COSTS INCURRED BY COUNSEL/GUARDIAN AD LITEM FOR THE MINORCHILDREN:
The balance due the Guardian Ad Litem (thru 1/30/03 totaling $5,920.00) shall be paid by the after tax proceeds of a withdrawal from the defendant's 401K. Said fees and costs shall be paid within two (2) months of the date of judgment.
The fees and costs of the Guardian Ad Litem for the minor children are in the nature of child support and, as such, are not dischargeable in bankruptcy.
 By the Court, Holly Abery-Wetstone, Presiding Judge
CT Page 3152